FILED UNDER SEAL

1 Julian Brew (SBN 150615)
  jbrew@hechtpartners.com
2 **HECHT PARTNERS LLP**
3 6420 Wilshire Boulevard, 17th Floor
  Los Angeles, CA 90048
4 Telephone: 310-804-8065
5 Facsimile: 646-492-5111
  Attorneys for Plaintiff-Relator,
6 **RELATOR LLC**



FILED
FEB 20 2024
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

C

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> *ex rel.* **RELATOR LLC**, a California limited liability company, <br><br> Relator, <br><br> v. <br><br> **CLINT WOODLEY**, an individual; **SHEILA MARKERT**, an individual; **ELCOR ELECTRIC, INC**, a California corporation, and DOES 1-10, <br><br> Defendants. | Case No. CV24 1003 WHA <br><br> **COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT** <br><br> **FILED *IN CAMERA* UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> <u>**DO NOT PLACE ON PACER**</u> <br><br> **JURY TRIAL DEMANDED** |

COMPLAINT

**FILED UNDER SEAL**

Plaintiff RELATOR LLC ("Plaintiff") complains of **CLINT WOODLEY**, an individual ("Woodley"), **SHEILA MARKERT**, an individual ("Markert"), **ELCOR ELECTRIC, INC**, a California corporation ("ELCOR"), and DOES 1-10.

**JURISDICTION & VENUE**

1. This Court has subject matter jurisdiction over the Plaintiff's claims brought under the FCA, 31 U.S.C. §§ 3279, et seq., pursuant to 31 U.S.C. §§ 3730 and 3732. This Court has supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. § 1367(a).

2. Plaintiff The United States of America is also located in the Northern District of California. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at all times material hereto, Defendants transacted business and are located in the Northern District of California, and acts proscribed by 31 U.S.C. § 3729 occurred in this district.

3. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendant's acts that form the basis of this Complaint occurred in the Northern District of California.

4. Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media. To the extent that there has been a public disclosure unknown to Relator, it is the "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B) and/or the public disclosure is a result of Relator voluntarily providing this information to the United States Government prior to filing this *qui tam* action.

**INTRODUCTION AND SUMMARY**

5. In this matter the founder and directors of an electrical contracting business misappropriated millions of dollars from the US Federal government's

**FILED UNDER SEAL**

Paycheck Protection Program ("PPP"). In order to obtain the loan, the Defendants submitted falsified loan documents to the SBA. Defendants made false statements to obtain more than the amounts permitted under the program, and falsified the number of employees on payroll. Defendants did not have any economic need for the loan, they simply took advantage. Defendants had no economic need for payroll assistance, assuming the loan was used on payroll. Defendants falsified additional documents which were presented to the government to obtain total loan forgiveness, billing millions to the US taxpayer.

6. The defendants used their electrical contracting business, ELCOR, to apply for and receive a PPP loan totaling $8,138,700.00, purportedly to cover payroll costs ("PPP Loan"). However, ELCOR, and the individual defendants who controlled the borrowers:

 a. Falsified number of jobs;

 b. Violated $100,000 maximum salary cap;

 c. Falsified the use of the loan on authorized expenses;

 d. Falsified the economic necessity for the loan; and

 e. Falsified eligibility for loan forgiveness.

7. <u>Falsified Number of Jobs Reported</u>. On the loan application for PPP Loan 1, ELCOR claimed to have 240 employees. The defendants grossly exaggerated and falsely stated the number of employees that they had in order to maximize the amount of loan proceeds that they misappropriated from the government. ELCOR's own LinkedIn page shows that the company has only 62 employees. Additionally, ZoomInfo shows that ELCOR employs 32 people. The defendants grossly exaggerated and falsely stated the number of employees that they had in order to maximize the amount of loan proceeds that they misappropriated from the government.

8. <u>Violated $100,000 Payroll Cap.</u> On their loan application, Defendants claim to have needed the loan to pay for 240 employees with respect to PPP Loan.

**FILED UNDER SEAL**

1  However, the loan amount obtained by Defendants is exorbitantly above the
2  $100,000 annual payroll cap. It is important to note that PPP loans to pay for
3  owner/partner draws and distributions are absolutely not allowed. The rules
4  explaining that any payroll costs over $100,000 are not permitted are clearly stated
5  in the loan applications. ELCOR received a $8,138,700.00 PPP Loan, and certified
6  that 100% of it was to be used for payroll expenses, which equates to an average
7  annual salary of **$162,774.00**[1], which is a clear and obvious violation of the $100,000
8  salary cap. Woodley and Markert, as the executives at ELCOR, used US taxpayer
9  dollars to pad their inflated salaries, while actual American small businesses suffered.

10      9.  <u>No Economic Necessity</u>. The PPP was made to help struggling
11  businesses <u>which were unsure about being *able* to</u> pay their workers. The SBA
12  required that the COVID pandemic caused enough economic uncertainty such that
13  company payroll was jeopardized. That is a distinct standard. The business must have
14  been in trouble to the point where its most important resource, its people, were not
15  affordable any longer. The PPP was not a free excuse to raid government coffers by
16  wealthy businessmen. The defendants did not need the loan -- there was no "need"
17  or "economic necessity" to pay Defendant's payroll expenses. Not only did the
18  defendants not need the loan, but it was also evident from the outset of the pandemic
19  that electrical contractors, like defendants, would thrive financially. Electrical
20  contractors, like defendants, unlike bars or restaurants, were deemed to play a vital
21  role in maintaining and repairing essential infrastructure, such as power grids,
22  hospitals, and telecommunication networks. These services were deemed crucial
23  during the pandemic, ensuring that communities could function and that people had
24  access to essential services. As a result, electrical contractors were in high demand
25  and able to secure lucrative contracts, ensuring their financial stability, and it was
26  clear at the very outset of the pandemic that there would be no business interruption

---

28  [1] The calculation is as follows (Loan Amount/# of employees) * 4.8)), which equals ($8,138,700.00/240) * 4.8

4
COMPLAINT

**FILED UNDER SEAL**

for defendants, and, in fact, that their business would increase. Furthermore, the pandemic forced businesses and individuals to adapt quickly to remote work and digital solutions. It was clear at the outset of the pandemic that with the increased reliance on technology, there would be a surge in demand for electrical contractors to install, upgrade, and maintain electrical systems, networks, and equipment necessary for remote work. From setting up home offices to establishing robust network connections, electrical contractors, like ELCOR, were able to take advantage of business opportunities to facilitate the digital transformation, making their services indispensable. With the increased demand for their services, claiming economic necessity to secure the PPP Loan meant that Defendants knowingly took advantage of a system meant for those genuinely in need. The Defendants did not and cannot show any decline in revenue during the pandemic, much less a decline so bad it threatened worker pay. Yet Defendants falsely certified they had "economic uncertainty" so they could take financial assistance from the US taxpayer.

10. <u>Money Not Returned</u>. The loan was taken by a business which grossly inflated their number of employees and violated the $100,000.00 salary cap. However, at some point the defendants could have changed course. They could have returned the money. They did not. They doubled down on their misappropriation by seeking loan forgiveness. The $8,138,700.00 in funds should have been returned immediately. This loan should never have been sought in the first place. Yet the Defendants went further by obtaining total loan forgiveness, billing the US taxpayers millions of dollars. *Defendants have not returned the loan proceeds to this day.*

11. <u>Further Falsification on Loan Forgiveness</u>. Defendants falsified further documents to receive loan forgiveness. Defendants had to attest as to the use of the funds and the amount used on authorized purposes. They could not because Defendants could not comply with the requirements of forgiveness given the exorbitant amounts borrowed and false statements regarding numbers of employees, and violations of the salary cap. So, Defendants also lied on their forgiveness

documents and application.

12. <u>Defendant's False Statements and Fraud</u>. Defendants knowingly and intentionally made many materially false statements to the government and bank to obtain the loan.

13. Plaintiff brings this action as relator on behalf of the United States to recover treble damages, civil penalties, and costs under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33 Plaintiff gave notice of its intent to file and full disclosure of the evidentiary basis to the Department of Justice ("DOJ").

## THE PARTIES

14. Plaintiff is a California limited liability company with its principal place of business in Los Angeles County, California.

15. Defendant Clint Woodley is an individual and, at all relevant times herein, is and was the Chief Executive Officer of ELCOR.

16. Defendant Sheila Markert is an individual and, Relator is informed and believes that at all relevant times herein, she is and was the Controller of ELCOR.

17. Defendant ELCOR is a corporation formed in California with its principal place of business located at 3310 Bassett Street, Santa Clara, California, 95054.

18. ELCOR is an electrical contractor.

19. The true names and capacities, whether individual, partner, associate, corporate or otherwise, of Defendant DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff, who therefore sues said Defendant(s) by such fictitious names. Plaintiff is informed and believes and thereon alleges that each Defendant designated herein as a "DOE" is legally responsible in some manner for the events and happenings herein mentioned. Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of said DOES, and add appropriate charging allegations against said DOES when their identities have been ascertained. Plaintiff is informed and believes that each of the DOE Defendants were

**FILED UNDER SEAL**

responsible in some manner for the injuries and damages alleged herein, and/or for the wrongful acts of some or all of the Defendants.

20. Plaintiff is further informed and believes that each of the Defendants, whether specifically named or named as a DOE, was an agent, employee, servant and/or representative of each of the remaining Defendants, and, in doing or failing to do the things alleged herein, was acting within the course and scope of said agency, employment, service and/or representation.

21. Plaintiff is further informed and believes that each of the Defendants, whether specifically named herein or named as a DOE, approved, ratified and/or acquiesced in the acts and omissions of each of the remaining Defendants.

22. Plaintiff is further informed and believes that each of the Defendants herein, whether named as DOES or otherwise, acted in concert, agreement and conspiracy with the other Defendants for the common purpose of engaging in a scheme to defraud as alleged below.

**THE CARES ACT AND PAYCHECK PROTECTION PROGRAM**

23. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act" or "the Act") (Pub. L. 116-136) became law and provided emergency assistance and health care response for eligible individuals, families, and businesses affected by the coronavirus pandemic. SBA received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

24. The CARES Act authorized loans to eligible small businesses struggling to pay employees and stay in business as a result of the devastating effect of the COVID-19 pandemic and resulting restrictions.

25. Section 1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck Protection Program" ("PPP").

FILED UNDER SEAL

26. On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139) was enacted to provide additional funding and authority for the PPP. On June 5, 2020, the PPP Flexibility Act of 2020 (Flexibility Act) (Pub. L. 116-142) was enacted, changing key provisions of the PPP, including provisions relating to the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness of PPP loans.

27. Under the PPP, in 2020, eligible businesses could obtain one SBA guaranteed PPP loan. Businesses were required to spend all loan proceeds only for employee compensation, rent or mortgage, and certain other specified expenses. Depending on their use of the loan proceeds as certified, they could qualify for loan forgiveness, up to the full amount of the loan.

28. The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. In order to obtain a PPP loan, whether a "First Draw" or "Second Draw" loan, an eligible business (through its authorized representative) had to sign and submit a PPP loan application (SBA Form 2483) online through the lender's platform. The PPP loan application (SBA Form 2483) required the business (through its representative) to acknowledge the PPP program rules and make certain certifications in order to be eligible to obtain the PPP loan, including certifying that their certifications were true.

29. Once the Borrower submitted its PPP loan application (SBA Form 2483) to a Lender, the participating lender processed the PPP loan application. If a PPP loan application (SBA Form 2483) was approved by the lender, it funded the PPP loan with its own funds, which were 100% guaranteed by the SBA.

30. After the Lender processed and approved a borrower's PPP loan application (Form 2483), but prior to the closing of the PPP loan, the Lender submitted to the SBA, the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) to the SBA applying for a guarantee on the loan. For a PPP loan to be approved, the Lender was required to Answer Yes to the following

questions in the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) as to the Borrower's certification of its General Eligibility to receive a PPP Loan:

| | | Yes | No |
|---|---|---|---|
| • | The Applicant has certified to the Lender that (1) it was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099MISC; (2) current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant; (3) the funds will be used to retain workers and maintain payroll, or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures; and (4) the Applicant has not and will not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (this does not include Paycheck Protection Program second draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)). | ☐ | ☐ |

SBA Form 2484 (emphasis added). Therefore, if a PPP borrower lied on its PPP loan application (SBA Form 2483), the PPP borrower's false certification caused the Lender to submit to the SBA with respect to that PPP Loan, a Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) that contained the PPP borrower's False Statement.

31. SBA Form 2483 includes the following certification, among others: "I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them" (the "Understanding Certification").

9
COMPLAINT

32. SBA Form 2483 also includes the following certification, among others: "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)" (the "Eligibility Certification").

33. SBA Form 2483 also includes the following certification, among others "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule" (the "Use of Proceeds Certification").

34. SBA Form 2483 also includes the following certification, among others: "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant" (the "Economic Necessity Certification").

35. SBA Form 2483 also includes the following certification, among others: "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud" (the "Worker Retention and Payroll Certification").

36. SBA Form 2483 also includes the following certification, among others: "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program." (the "Single Loan Certification").

37. SBA Form 2483 also includes the following certification, among others: "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571

**FILED UNDER SEAL**

by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000" (the "No False Statements Certification").

38. After the borrower submitted a PPP loan application, it was processed by the participating lender. If the PPP loan application was approved, the participating lender funded the loan using its own monies, which were then guaranteed by the SBA. Generally, in the event the borrower defaulted on a PPP loan, the SBA would purchase the borrower's debt from the lender and be responsible for its repayment.

39. Under applicable SBA rules and guidance, recipients of PPP loans could apply to have principal and interest on the PPP loan fully forgiven, meaning that the borrower would owe nothing and would have no obligation to repay the PPP loan. To obtain full forgiveness of the PPP loan, borrowers had to attest that they had "not reduced the number of employees or the average paid hours of [their] employees" during the loan period, that the loan proceeds had been spent on payroll costs and other permitted expenses and that at least 60% of the loan proceeds had been spent on payroll costs (hereafter the "Loan Forgiveness Certification").

40. Loans could only be used for certain permitted expenses, such as to pay employees' salaries, employee benefits, mortgage interest, rent, utilities or worker protection costs related to COVID19.

41. More specifically, the loan forgiveness application (SBA Form 3508), revised as of July 30, 2021, included the following certifications, among others:

(1) The dollar amount for which forgiveness is requested:
- was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);

- includes all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;
- includes payroll costs equal to at least 60% of the forgiveness amount;
- if a 24-week Covered Period applies, does not exceed 2.5 months' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $20,833 per individual; and
- if the Borrower has elected an 8-week Covered Period, does not exceed 8 weeks' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $15,385 per individual.

(2) I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.

(3) The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness.

(4) The Borrower's eligibility for loan forgiveness will be evaluated in accordance with the PPP regulations and guidance issued by SBA through the date of this application.

42. On April 23, 2020 in FAQs No. 31, the SBA reiterated that the economic necessity certification must be made in good faith and that publicly traded companies are not likely to be able to make that certification in good faith, stating "it is unlikely that a public company with substantial market value and access to capital markets will be able to make the required certification in good faith…"

**FILED UNDER SEAL**

## DEFENDANTS' FRAUD

43. During round 1 of the PPP, Defendant ELCOR applied for a PPP loan for $8,138,700.00. It was approved on April 16, 2020, by the SBA for the full amount, which was disbursed. The loan was facilitated by Zions Bank, A Division of. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had 240 employees for which it needed the loan. This loan was forgiven on December 21, 2021.

44. Defendants PPP Loan violated the $100,000 salary cap by a sizeable margin, with the PPP Loan being 62.7% over the limit. These false statements were intentional and not an accident.

45. In addition to providing the correct numbers of employees, all borrowers should carefully review the required Economic Certainty certification on the Borrower Application Form stating that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

46. ELCOR abused the PPP program, from misrepresenting their economic need for the loan, to misrepresenting the number of employees, to willfully ignoring their ineligibility, to maximizing the amount of the loan based on false statements and then obtaining loan forgiveness. Discovery will reveal where the millions in PPP funds were actually spent, but what is obvious is that Defendants *did not need any money from US taxpayers*. The Defendants' business is and was highly profitable during the pandemic, just like most in their industry. They did not suffer any business loss and certainly had the money to pay their own workers' wages.

47. Defendants signed the loan applications, thereby endorsing the Understanding Certification, which means that they agreed that they understood the rules and guidelines of the PPP, including, without limitation the rules regarding use of proceeds and the certifications made.

48. The proceeds of the PPP Loan were not and could not have been used only for authorized purposes consistent with the PPP Rule, because, among other

**FILED UNDER SEAL**

things, ELCOR received excessive amounts, far beyond the $100K salary cap on its PPP Loan, therefore, such excess money could not have been used on authorized expenses, since the amounts did not confirm with the PPP Rule. Furthermore, ELCOR misstated the number of employees they had by a large margin, and since they could not pay employees that did not exist the proceeds of the loan were used on unauthorized purposes. Accordingly, when Defendants made the Use of Proceeds Certification, the certification was false.

49. The proceeds of the PPP Loan were not necessary to support the ongoing operations of the Defendants' electric contracting business. The business was nowhere near a financial precipice. Far from it. The business had considerable financial resources to pay its own workers, assuming that is where the money was spent rather than into the pocket of the CEO and its executives. Therefore, when Defendants made the Economic Necessity Certification, the certification was false.

50. The PPP loan money was only allowed to be used on *authorized* expenses. The proceeds of the PPP Loan were not permitted to be used to pay for the very much affordable business costs for the Defendants' successful electrical contracting business, therefore when Defendants made the Worker Retention and Payroll Certification, the certification was false.

51. By virtue of the above false statements, when Defendants made the No False Statements Certification, that certification was false.

52. The Defendants actively pursued and obtained loan forgiveness. Because the Defendants violated the $100K salary cap and grossly inflated the number of employees on their application, its representation on its forgiveness application that it spent 100% of the loan proceeds on eligible expenses was not truthful.

53. The SBA would not have forgiven the loan if they knew Defendants' certifications described above were false. They also would not have forgiven the loan if they knew the proceeds had been used to increase profits instead of paying

**FILED UNDER SEAL**

1 their employees.

2     54. As a result of the forgiveness, Defendants have not repaid the loan and have kept the proceeds, and the loan has been repaid with money from taxpayers, including the small businesses and owners who were supposed to receive the PPP funds instead of repaying a profitable electrical contracting business's loan that it never should have received, let alone had forgiven.

## THE FALSE CLAIMS ACT

    55. The False Claims Act prohibits fraudulent conduct in connection with federal programs, including the knowing submission of false claims for payment to the government. See 31 U.S.C. § 3729(a)(1)(A). In these circumstances, liability may attach if the omission renders those representations misleading. 41. 31 U.S.C. § 3729(a)(1)(A) and (B) of the FCA provide that:

    (1) . . . any person who—

    (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

    (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,

    . . .

    (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . .

    31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2020).

    42. The scope of a false or fraudulent claim is to be broadly construed. As used in the FCA, a "claim"

    (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the

15
COMPLAINT

FILED UNDER SEAL

money or property, that—

  (i) is presented to an officer, employee, or agent of the United States; or

  (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

  (I) provides or has provided any portion of the money or property requested or demanded; or

  (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . .

  31 U.S.C. § 3729(b)(2) (2020).

56. A person who violates the False Claims Act during the time period at issue "is liable for a civil penalty as adjusted, plus 3 times the amount of damages which the United States Government sustains because of the act of that person." 31 U.S.C. § 3729(a). See 28 C.F.R. § 85.3(a)(9); Department of Justice, 28 CFR Part 85, Civil Monetary Penalties Inflation Adjustments for 2022 published at: https://www.govinfo.gov/content/pkg/FR-2022-05-09/COMMERCE/2022-09928.COMMERCE.

### FIRST CAUSE OF ACTION
### FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A-B))

57. Plaintiff alleges and incorporates by reference each and every allegation contained in all prior paragraphs of this complaint.

58. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

59. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A). Specifically, each of Defendants' Economic Necessity, No False

Statements, Eligibility, Use of Proceeds, Understanding, Worker Retention and Payroll Certifications described above all were knowingly false, and relied upon by lenders and the SBA in approving the PPP Loans. Their request for forgiveness contained a further misrepresentation that the loans had been used only for authorized purposes.

60. By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

61. The Government and its agents and contractors relied on those false statements in approving and making the loans and subsequently forgiving them, leaving the burden of repayment on taxpayers.

62. Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $12,537.00 and not more than $25,076.00 for each and every violation arising from Defendants' unlawful conduct alleged herein, and attorneys' fees in an amount to be proven.

## CONCLUSION

63. The Defendants abused the PPP. The PPP was meant for businesses struggling to afford payroll. Now that program is dry, and many are out of work. The American people have a right to reconciliation.

## **PRAYER FOR RELIEF**

WHEREFORE, qui tam Plaintiff/Relator prays for judgment against Defendants, as follows:

1. That this Court enter judgment against each Defendant in an amount equal to three times the damages that the United States has sustained because of Defendants' action, plus a civil penalty of not less than $12,537.00 and not more than $25,076.00 for each and every false claim as are required by law, together with all such further relief as may be just and proper.

**FILED UNDER SEAL**

2. Such other relief as this Court may deem just and proper, together with interest and costs of this action.

3. Reasonable attorney fees, litigation expenses, and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 20, 2024          HECHT PARTNERS LLP

By: _____
JULIAN BREW
Attorneys for Plaintiff-Relator
RELATOR LLC